# Horton's Appeal.

The order or decree of a Court of Common Pleas, sitting in Chancery, should conform to the prayer in the bill. The better opinion seems to be that the special decree, suited to the case of the parties, should be asked for, in the bill. A Chancellor will make no decree where the respondent swears directly, in answer to the allegations in the bill. In such cases, there must be another witness, or else corroborating circumstances, to overbear the defendant's answer.

An assignment by one of two partners, of all his interest in the partnership concern, works a dissolution of the partnership; after a dissolution thus effected, the assignee, or incoming partner, cannot withdraw the effects, nor his share of them. The remaining or stationary partner is entitled to hold possession for the purpose of paying off the debts, and winding up the business of the concern.

Appeal of John Horton, defendant, from the decree of the Court of Common Pleas of *Montgomery county*, sitting in Equity, in the case of Sampson Tams and Jacob K. Olwine, plaintiffs *vs.* the said John Horton, defendant.

Statement of facts:

John Horton and Samson Tams, went into the iron business at the William Penn Furnace, in Montgomery county, on the 29th of Dec. 1847. By their articles of copartnership, Tams was to furnish the capital $10,000—including therein, the lease of the furnace as part of said capital at a valuation of $3100. Horton who is an iron master, and the only one having a knowledge of the business of manufacturing iron, was to attend to the business at the Furnace, and keep the same under his personal supervision. Tams was to attend to the sales and to the financial affairs, and to furnish without charge the services of his son to keep the books. By a supplement to the articles, the capital to be furnished by Tams was to be whatever was necessary to carry on the business over and above an advance of $15 per ton, which was to be obtained from a commission merchant.

The parties continued together in business until October 24, 1848, when Tams made a transfer on that date of the lease and all his interest in the partnership property to Jacob K. Olwine,

one of the complainants in this case. This transfer was by writing under seal.

At or about the date of this transfer to Olwine, Tams became insolvent—and Horton having learned the existence of this transfer to Olwine, and Tam's insolvency, he claimed that they operated as a dissolution of the firm, and went on to work up the stock of ore on hand—individually, and as remaining or solvent partner —and to appropriate the proceeds of the iron to the payment of the creditors of the firm.

On the 6th of March, 1849, Tams and Olwine filed a bill in Equity against Horton, in Montgomery county—alledging among other things, that the transfer to Olwine was made with Horton's knowledge, and was intended as a collateral security for advances, which it charged that Tams procured Olwine to make for the purpose of carrying on the business—that Olwine did make advances accordingly, in cash and acceptances to the amount of $6200; and charging that Horton had assumed the control and ownership of all the assets of the firm, and denied them all access to the books, and all control and management of the business of the furnace, and was carrying on business with the stock at the furnace in his own name, and for his own account.

The prayer of the bill was for *a general injunction*, restraining Horton from all further interference in the administration of the assets of the firm—for the appointment of a receiver—and *for general relief*.

Horton's answer was filed on the 12th of March, 1849. It denied that Tams had furnished capital according to his agreement; that the transfer to Olwine was made with his knowledge, or that it was intended as a collateral security; and averred that it was a positive transfer, and that Olwine had attempted to assume the place of a partner on the strength of it. It also denied that any advances had been made by Olwine to the firm; declaring that there had been transactions of a private nature between Olwine and Tams, in which an unauthorized use had been made of the firm name, and averring the insolvency of Tams—stating that after such insolvency and transfer, and after Olwine's attempt to exercise the power of a partner, the respondent had assumed the entire charge and control of the furnace and the stock then on hand there, consisting of iron and ore, with a view of working it up and converting it into money for the purpose of paying the proceeds to the creditors of the firm—and for no other purpose whatever—and that in execution of that purpose, he had realized at the time of the filing of the answer, out of the ore worked up, $6346 97—out of which he had defrayed the expenses of keeping the furnace in blast, and the wages of hands, and had appropriated all the balance, viz: $3247 51 to the payment of the firm creditors, excepting the sum of $248 03, which he had then

in hand, according to the account annexed to his answer, and denying that he had appropriated or intended to appropriate any part of the assets, except in payment of the creditors of the firm —or that he was carrying on the business on his own account, or for any other purpose than to wind up the concern.   He further denied preventing the complainant Tams from having full and free access to the books and accounts—and averred that he was always willing to allow him access to and inspection of the same.

*The cause was heard on bill and answer*, before the president Judge of said court, *alone*—and after the hearing the Judge made the decree upon which this appeal is taken.   The injunction prayed for in the bill, and the appointment of a receiver were refused, and the judge awarded an injunction *not prayed for in the bill*, to wit: "to restrain John Horton from preventing Sampson Tams, the plaintiff, from exercising in future all the rights and duties declared in the articles of copartnership subsisting between the parties," which injunction was accordingly issued and served.

The appellant assigns errors as follows:

1. The Judge had no power to order the injunction.

2. The Judge erred in not giving full credit to the answer, and in not refusing the injunction.

3. The Judge erred in deciding that the assignment from Tams to Olwine did not dissolve the copartnership of John Horton & Co.

4. The decree made by the Judge was not warranted by the prayer of the bill, nor by any of the previous proceedings in the cause.

The case was argued by *Townsend* and *Price* for Horton, the appellant.

As to first error:

The Equity jurisdiction in such cases as the present, is conferred by the act of 16 June, 1836, sec. 13, on the *court*, and not on any *one* of the judges thereof.   *Purd.* 7 Ed. p. 250.

In Riley *vs.* Ellmaker, 6 *Wharton* 545, the Supreme Court decided that the Equity powers conferred on that court by the same act of 1836, were not exercised by a single judge.

And an act of assembly, 26 July, 1842, sec. 9, see *Purd.* 7 Ed. p. 286, was passed to confer that jurisdiction on one judge sitting at Nisi Prius.

*Cuyler* for appellee.

The opinion of the court was delivered by

COULTER, J.—The bill concludes with a prayer for a special injunction, that John Horton, the defendant, shall be restrained from further interference in the affairs of the firm, and that the court

[Horton's Appeal.]

appoint a receiver; and also a prayer for such further and other relief as may be meet and proper. The court however refuse to appoint a receiver, or restrain John Horton from interference; but order specially that he shall not prevent Tams from exercising all the rights and duties of a partner.

This is a special order, not asked for by the complainant's bill. The practice of courts in chancery in this country is embodied in this particular in the 20th rule of this court on the subject which is as follows: "The prayer of the bill shall ask the relief, to which the party supposes himself entitled, and also shall contain a prayer for general relief; and if an injunction or any other special order, pending the suit, is required, it shall be specially asked for." This conforms to the rule of the United States Courts, and the practice has been in accordance with it; and there is good reason for it, as in such case the respondent will have notice of the point to which he ought to direct his defence. It imposes no hardship on the complainant, inasmuch as every suitor is supposed to know the relief he requires; and if he has started on the wrong track, he may have leave to amend his bill, upon the proper suggestion being made. The special order therefore, made by the judge below, was erroneous, not being prayed for. Indeed, under the circumstances disclosed in the bill and answers, that decree would seem to afford no relief to the complainants; and hence, perhaps, it was not asked for. The parties appear to be in such a state of discord, hostility and disagreement, that it would be impossible for them to transact their business in peace, and with the considerateness and mutual deliberation necessary to their prosperity.

Perhaps a Chancellor would decree a dissolution, independent of the assignment of the share of Tams hereafter mentioned, although there is some conflict in England as to the necessity of asking for the special decree, suitable to the parties' case; yet the better opinion seems to be, there, as well as here, that it must be asked for, in the bill, substantially. 1 *Daniel's Chan. Pract.* 502 Jacob *vs.* Hall; 12 *Vesey* 458; 1 *Smith's Chan. Pract.* 587.

The judge below predicates his decree mainly on the fact that Horton does not clearly and distinctly *state* that the assignment by Tams to Olwine was merely collateral, and with a view to raise funds to carry on the concern. But there is a clear, distinct and unequivocal denial in the answer. Horton says that Tams assigned all his interest in the concern to Olwine, who presented himself and claimed to be admitted as a partner, by Horton. He further answers that he knew nothing of the assignment, never assented to it, refused to admit Olwine, and considered the firm dissolved, and is proceeding accordingly. This full answer, shewing that Olwine claimed to be admitted as a partner, *under the assignment*, is at least equivalent to the bill; because although Olwine signs the bill, he does not swear to its contents; that is done by Tams alone.

A Chancellor will make no decree where the respondent swears directly in answer, and in opposition to its allegations. In such cases there must be *another* witness, or else corroborating circumstances to overbear the defendant's answer. Where it is oath against oath, they stand in equilibrium. In an anon case, 3 *Atkyns* 270, Lord HARDWICK says: "where there is oath against oath, the plaintiff shall not have a decree for relief."

But I am at a loss to perceive how the assignment can be considered collateral, in the sense attributed to it in the bill. It is an absolute sale and assignment by deed of all Tams' interest and title, in the real and personal property, in any wise appertaining to the furnace, known by the name of the "William Penn Furnace;" and also his right, title and interest, in and to the lease of the said furnace property, which lease is to be assigned to Jacob Olwine, who is to have immediate possession. Now the lease-hold of this furnace, and the property thereto appertaining, constituted the assets and business of the firm, of which Olwine was to have immediate possession, and did, as appears by Horton's answer, claim to be admitted into possession. The bills set forth that this assignment was to be a collateral secuirty to the said Olwine, that the amount which should remain to the credit of the said Sampson Tams, when the partnership business of the firm of John Horton & Co. should be finally closed up, for advances made by him, and yet, in the very process of conducting the business of the firm to a close, and winding up its concerns, the very things assigned would be used, turned into money, passed away, and only appear on the books, in the language of the bill, "as a credit to Sampson Tams when the business of the firm should be finally closed up."

That such an assignment worked a dissolution of the partnership is established in our own books and jurisprudence; it is therefore unnecessary to examine the cases cited. It was foreshadowed in Mason *vs.* Caldwell, 1 *Wharton* 381, and directly decided in Cochran *vs.* Perry, 8 *Watts & Serg.* 262, where it was ruled, that when a partner sells his share to a stranger, or even to another member of the firm, the partnership is dissolved, unless the articles provide for such sale and transfer. And certainly it seems conformable to reason and justice that it should be so. Partnerships are formed and entered into by reason of the confidence the members repose in each other, their mutual capacities and knowledge of business; and firms are very much trusted by creditors, on the same basis. When one sells to a stranger, the basis of the trust and confidence is broken up; a stranger coming into the concern, would not be liable to pre-existing engagements. It would in fact, be a new firm; and consequently requires the assent of the stationary, as well as the releasing and incoming partner.

After a dissolution thus effected, the incoming partner could not withdraw the effects, nor his share of them. The remaining, or

[Horton's Appeal.]

stationary partner, would be entitled to hold possession, for the purpose of paying off the debts and winding up the assets of the firm. That is not only his right, but his duty; and that would appear to be what Horton is desirous of doing.

The special decree, being erroneous, is reversed, and the bill is dismissed.

Decree reversed and bill dismissed.